THE NORTHEASTERN RAILROAD COMPANY v. BARNETT.

The verdict was warranted by the evidence, and was not contrary to law.        Judgment affirmed; cross-bill of exceptions dismissed. June 8, 1892.

Railroads.    Negligence.    Before Judge HUTCHINS. Clarke superior court.    October term, 1891.

Barnett sued the Northeastern Railroad Company for damages from personal injuries. The defendant pleaded not guilty; that at the time of the alleged injury plaintiff was not employed by it, but by the Richmond & Danville Railroad Company, its lessee; and that plaintiff and the R. & D. R. R. Co. did on June 18, 1887, in consideration of $143 paid to plaintiff by the R. & D. R. R. Co., release this defendant from all liability to plaintiff on account of the injury, and relinquished any right of action

plaintiff then had or might have against this defendant. The verdict rendered at the first trial was set aside and a new trial granted. On the second trial a nonsuit was awarded; the plaintiff excepted, and the judgment was reversed. 87 *Ga.* 199. Upon the last trial there was a verdict for plaintiff for $2,500. Defendant moved for a new trial, upon the grounds that the verdict was contrary to law and evidence. The motion was overruled. The plaintiff's cross-bill of exceptions is not material here.

Plaintiff testified: On October 9, 1886, I was hurt on the Northeastern railroad at its depot in Athens. Was train-hand and baggage-master on that road, part of my duties being to couple and uncouple cars. Was employed by Cox. The train was standing in the railroad yard, and I went in to uncouple the first car from the tender. To the best of my recollection the train and engine were standing still when I went between the cars. The engine and tender came back on me and hurt me, for if the car had come back it would have thrown my hand nearer the car than it did. It was my duty to go in there as I did. I was to signal the engineer before he moved, and they had no right to move until I had given that signal. I did not signal them at all. My hand got caught between the bumpers. The engine must have moved, because it is the custom to leave the link in the tender, and if it had been in the car it would have come this way. If they had stood still my hand could not have been mashed. They gave me no notice that they were going to move. I was hurt before I knew anything else. My hand and wrist were crushed. I was not able to go to work until September, 1887. My doctor's bill, nurse hire and board, which I paid, amounted to $143, and I had other expenses growing out of the injury. Was 27 years old, and was then earning $30 a month. On an average, could do half as much work now as formerly,

but could not do car-coupling. When I got hurt the car was on a down grade. Cox was the regular conductor of the train. I went to work on September 15th, my run being from Athens to Tallulah Falls. It was only a few minutes after the train came in when I went to make this uncoupling. The coupling was made with an ordinary straight link, so that when it was in there the bumpers could come together. A drag-bar had been formerly used, which is longer and stouter than a link. I do not know whether if the bar had been there it would have let the bumpers come together. The drag-bar is fixed so at both ends the bumpers cannot get together. The drag-bar had been broken, and I suppose we did not use one that day because they did not have any. If it had been in there that day I do not know whether I would have been hurt or not. I went in there with the engine and car still. Pulled the pin out of the bumper on the flat car—the top of the pin is on the top of the car, but I reached for the head of the pin, and they met. My hand was not in between the bumpers. I do not know whether the engineer ran the engine back on me or not. The bumpers were pretty nearly the same height, and if bumpers are the same height a short link does as well as a long one. I am now clerking in a store and get $30 a month, and suppose it is the same I was getting when this case was tried before. I made some of my reports as agent to McClesky, a man in Atlanta, who at the time I reported to him represented the R. & D. railroad. Cox ran from Athens to Tallulah Falls. I did not ask him what railroad he was employed by, or who I was to work for. He just said go to work, and I went. The Northeastern railroad began at Athens and ran to Lula, then used twelve miles of the R. & D. track to Cornelia, then known as Rabun Gap, and then ran on the Northeastern track to Tallulah. The train I was on ran there one day and back the next. It had been running that

v 89-26

way several years. It was called the Northeastern. I think at that time the engines and cars were marked "Northeastern Railroad." Do not think anybody had told me of a change from the Northeastern to the Richmond & Danville. There was a time when it was not known who controlled the road, but at that time it was the Northeastern; I had no knowledge to the contrary. I went in to uncouple the engine from the cars, but have some doubts about whether I got that done or not. The engine and tender came back on me and caught my hand. I won't be positive whether it pushed me down or not; think I made a little stumble as I went in. It is reasonable to suppose that was caused by the car coming back on me. Whether the link or the drag-bar had been there, if the engine had stood still I would not have been hurt. The engine only had to come back a very short distance, not over six or eight inches, to make the bumpers come together. The best of my recollection is, that I was between, and the tender came back on me and I stumbled; could not say what caused me to stumble. Cain or Kelly or myself had put that pin in there; do not know whether we had orders to put it in or not. We did it after the drag-bar was broken.

Cain was a brakeman, and was three or four cars from plaintiff when plaintiff was hurt. The car Cain was on was still and it was attached to the train at the time. When he got to where plaintiff was, one of the pins was out of the bumper. It was uncoupled and the engine had pulled forward. Cain was employed by Cox and did not know who was operating the road then, but before he quit it was the R. & D. The receipt hereafter mentioned was signed by plaintiff on a Sunday after he received a letter from Mr. Barrow, and in pursuance of a promise set out in that letter. Plaintiff had an agreement with Barrow at one time to settle the case. Barrow was then president of defendant and an attorney for

the R. & D. The terms of the agreement were, that they would pay plaintiff's doctor's bill, nurse hire and board for nurse, and give him a job of work. Plaintiff told Barrow he would take a flagman's place or a good office job, but preferred the latter. The flagmen were getting $30 a month. Plaintiff receipted for the voucher but did not read it before he signed it. He was passing by the depot, and Cheney, the agent of the Northeastern at Harmony Grove, asked him to come in and sign a receipt, saying it was to be sent back on that train, and plaintiff just signed it. They did not tender him the position he asked for. They had agreed to give it to him. He has tendered them back the money they paid him, with interest, and is ready to pay it back now. Plaintiff signed the paper and got the money. The arrangement between him and Barrow was not in writing. They did offer him a place afterwards as agent at Gillesville at $25 a month, and he offered to work there for $35 with an increase in two or three months. They said they had been paying that agent $15, and offered to raise it to $25 for plaintiff's benefit. He declined the place as they offered.

For defendant there was evidence that in July, 1886, a circular, hereafter referred to, was sent out and, probably within five or six days after its date, was posted in the freight-office at Athens. A witness who testified as to this also testified that he was working in July, 1886, on the Northeastern division of the R. & D. railroad at Athens. Plaintiff was in and out of that office every day he came in from his run. The bulletin board on which the circular was posted is put up for the information of the employees, and the employees looked at it frequently. All the orders and directions from headquarters were posted there. Cox thought that in August, 1886, he was working for the R. & D. railroad. Did not remember that he said anything when he em-

ployed plaintiff, about the railroad he was working for. Plaintiff did not ask which road he was working for. Was a conductor on the Northeastern a long time, and is not sure when the change took place. It is true that when plaintiff was employed the engines and cars were marked Northeastern, and tickets were then printed Northeastern; they are to-day. At that time the road was called the Northeastern, and the schedule in the newspapers was printed Northeastern. Cox's impression is that the road he was working for when plaintiff was employed was the R. & D. He testified that at the yard there was a heavy grade, and if brakes were taken off roughly it would start the cars. The engineer of the train which hurt plaintiff testified : If a man should go in to uncouple, a safe way would be to have his hand over the dead blocks; he would be in no danger from the tender or the bumpers. One can reach over the dead block and get the pin. The car had dead blocks on it. He found blood on the end of the dead block and on the edge of the bumper, which indicated that plaintiff's hand had gone round instead of over the dead block. The proper way is to put the hand over the dead block. The train came on, brakes were put on the cars and the train dropped back. Kelly made a coupling and the train rolled back. Plaintiff was standing where the next uncoupling had to be made, and walked in and directly holloed to the engineer to slack up, that the engineer had his hand. Plaintiff got it caught by these bumpers having a spring in them, and when the pressure was off of them they sprang back. Brakes were on the cars behind and on the tender, and when the springs reacted that made the rebound. The drag-bar which had been used was broken that day at Tallulah. The drag-bar is used more than anything else now, but the engineer had used the link as much as the drag. The bar is much safer, for a man cannot get hurt

unless he reaches around the bumper. It was necessary to use the link after the bar got broke, and it was plaintiff's duty to go in there and make that uncoupling. If one went in to uncouple and the cars were to move forward or the engine brakes on, and he were not expecting the movement, it would strike him, if the link was a short one ; the tendency would be for him to lose his balance. The engineer supposed he would throw out his hand to keep from falling, but did not think he would try to catch the pin. It is the duty of the engine to stand still while the coupling is being made, but "you cannot hold the springs unless you hold it back." There is a grade where the accident happened. A few days before this Cain was working there, who did not like the old superintendent of the Northeastern railroad, and the engineer said to him that he was not working for that superintendent, and Cain said, no, he was glad of it. "We had been informed when the change took place, and I remember the time." Do not remember seeing the circular above referred to posted at the office ; there were a great many received there, and we were required to examine the bulletin-boards. Witness was shown that circular order, and said he remembered seeing that, but did not know the date. The grade at the point in question is between three and four tenths of a foot in one hundred feet, which is not an unusual grade for depot-yards. Four tenths is a considerable grade. Cars will stand on the track without brakes on them. One can hold up a plank and make it stand, but the slightest pressure will make it fall, and that is true about cars on that grade.

The pay-roll of the Richmond & Danville Railroad Company for the Atlanta and Charlotte Air Line Railway, Northeastern Railroad division, for August, 1886, showed that plaintiff had acknowledged the receipt from the Richmond & Danville Railroad Company, as acting

agent for it at Harmony Grove during August, 1886, of
a certain sum, and that he had also acknowledged re-
ceipt from it, as train-hand for two days, at the rate of
$30 .per month.    The receipt or voucher mentioned
above was for $143, received of the treasurer of the
Richmond & Danville Railroad Company by plaintiff,
June 18, 1887, "for amount in full settlement of all
claims for damages and of the entire right of action in
the case of W. B. Barnett against Northeastern Rail-
road Company, now pending in the superior court of
Clarke county, and of any and all the claims or de-
mands springing out of the occurrence upon which said
action is based."    An "operating agreement" between
the Northeastern Railroad Company and the R. & D.
Railroad Company, dated June 14, 1886, was introduced.
It recited that the N. E. R. R. Co. had the right to con-
tract for and use track of the A. & C. A. L. Railway
Co., from Lula to Cornelia, which break in the line of
the N. E. R. R. had not been built; that the N. E. R. R.
was so located as to be dependent upon the lines con-
trolled by the R. & D. R. R. Co., for a connection and
through business to distant points, as well as a contin-
uous business over its own entire route, and could be
most economically and judiciously operated and devel-
oped by a unity of management under the direction of
the R. & D. ; that in order to obtain the full use, etc. of
the complete portions of its railroad, enjoy its corporate
rights, perform its corporate duties and thereby promote
competition and prevent monopoly, it was necessary for
the N. E. R. R. Co., to provide and maintain the means
by which the distant portions of its railroad might be
connected, which could only be secured in the most
economical and advantageous manner by an agreement
for the permanent use of the roadway, etc. of the At-
lanta & Charlotte Air Line, and with the aid of the
lessee thereof, the R. & D., thus forming a continuous

and connected line of railway for traffic from Athens
to Tallulah Falls ; that the N. E. R. R. Co. owed the
R. & D. R. R. Co. $75,000 unsecured rent of twelve
miles of road, money advanced, etc. ; and that the equip-
ment of the N. E. R. R. Co. was insufficient and in-
adequate, needing to be renewed and increased and
thereafter maintained, repaired, etc. ; it had not then or
prospectively the means necessary, and its indebtedness
was increasing and would continue to increase unless
something was done to increase its earning capacity,
etc.    Therefore it was agreed, that from June 14, 1886,
the N. E. R. R. Co. would use the Air Line track from
Lula to Cornelia under the terms of this agreement, as
a condition precedent to this right forwarding over said
line of railway all of its traffic of every kind to points
accessible thereby ; that in consideration of the use of
this line and of the furnishing of rolling-stock, etc., as
thereinafter provided, the Northeastern would pay to
the R. & D., during the continuance of the agreement,.
a certain amount for each mile of said line above men-
tioned ; that all trains over all portions of the North-
eastern railroad should be exclusively controlled, man-
aged, operated, etc. by the R. & D., its officers, agents
and servants, or such of the Northeastern as the R. & D.
might require, accept or permit to do so, under such or-
ders, rules, etc. as the R. & D. might adopt and pre-
scribe ; that all fares, charges, receipts and income for
transportation over the Northeastern should be pre-
scribed, varied, regulated or agreed upon, and collected
and accounted for as thereinafter provided by the R. &
D. ; that at all times during the continuance of the agree-
ment, the R. & D. should have the right to take posses-
sion and use, occupy and exclusively hold, manage, op-
erate, control and possess, as fully as the Northeastern
could or might, the whole or any part of the railroad
tracks, appurtenances, equipments, etc., then owned, or

which might be thereafter acquired by the Northeastern for the construction, maintenance, use or operation of its entire railroad, but all additional rolling-stock, equipment or other property should be provided by the R. & D., and all the property of the Northeastern should be properly repaired, renewed and maintained, and should be kept in as good order as at the date of the agreement, it being agreed nevertheless that the R. & D. should have the right to sell any of the rolling-stock or other property which might become unfit for use, or not be needed, replacing the equivalent and returning it at the expiration of the agreement; that the R. & D. should perform and have the benefit of all contracts theretofore made by the Northeastern, and so far as it should undertake to manage and operate the Northeastern and its properties, perform all contracts or charter obligations of the Northeastern, and defend all suits against the Northeastern for any violation or neglect of said duties, or any neglect, fault or omission of the Northeastern, its agents or servants, while using, managing, controlling or operating the property, business, trains or cars of the Northeastern, and pay and discharge all just and valid claims or judgments that might be made or obtained against the Northeastern by reason of any such neglect, fault or omission; that in order that the management of the Northeastern might be united under the management and direction of the R. & D., the Northeastern would appoint, employ and retain as superintendent, traffic manager, general passenger and freight agent, such persons only as might be designated by the R. & D., all of whom should be under the general orders and direction of the general manager of the R. & D.; that the R. & D. should keep separate and distinct accounts of all money collected, received and disbursed by it for the account of the Northeastern under the terms of this agreement, which account should be open

to inspection of the president, treasurer, or duly author-
ized agent of the Northeastern, and should furnish to
the Northeastern annual statements of such receipts and
disbursements, etc.; and that this agreement should con-
tinue of force until June 14, 1911 (unless notice be
given as provided), and could be continued from year to
year.   There was a letter of plaintiff, dated July 23,
1886, to E. Berkeley, " Supt., Atlanta, Ga.," asking for
a position as baggage-master on the Northeastern rail-
road, and it was shown by Berkeley that on July 1, 1886,
he was superintendent of A. & C. division, R. & D.
R. R. Co., and as such took charge of and operated the
N. E R. R. as part of this division during that and sub-
sequent years, and that at the time he took charge of
the N. E. R. R. he lived in Atlanta.   Also, letter from
Berkeley, superintendent, to Cheney, agent at Harmony
Grove, asking if plaintiff intended to accept the Gilles-
ville agency at $25 per month, and stating that this was
the first position that he had to offer which he thought
plaintiff could fill, that the place was not really worth
that much and he could afford to pay no more for it.
Also, a ticket having on its face "N. E. R. R. Co. of Ga.
from Nicholson to Harmony Grove," and on its back
"October 13, 1891, R. & D. R. R. agent," stamped.   The
circular order referred to above was headed:   "The
Richmond & Danville Railroad Company.   Office of the
General Manager, Richmond, Va., July 1, 1886."   It
stated that the R. & D. having entered into a contract
with the N. E. R. R. Co., for the maintenance and opera-
tion of the railroad of the latter, that road would there-
after be operated by the R. & D. as a part of the A & C.
Air Line division, and the authority of certain named
general officers of the R. & D., and of certain division
officers in their respective departments, was extended
over the Northeastern road.   Among these division of-
ficers were Berkeley, superintendent, McClesky, general

freight agent, and Bernard, general agent, Athens, Ga. Also, a letter from Barrow to plaintiff, May 2, 1887, stating willingness to comply with terms of settlement embodied in plaintiff's proposition, which was accepted and which terms plaintiff would remember, and asking when plaintiff would be ready to go to work, and the amount of doctor's and nurse bills. Also, letter from Barrow to plaintiff, of May 23, 1887, stating that he had made out and forwarded for approval voucher for $143 in plaintiff's favor, covering doctor and nurse and board, and money would be forwarded as soon as received, and offering to pay other doctors' bills; and that Berkeley desired to know how plaintiff's hand was, so he might designate work for him to do. Also, letter from Cheney to Berkeley, of June 30, 1887, stating that plaintiff refused the Gillesville agency at $25 per month, and all they could get out of him was, that he would not work for that sum and that Mr. Barrow had agreed he should have a good job, that he was ready to go to work but would not work for this salary, etc.; also, letter from Berkeley to Barrow, enclosing the last mentioned letter and stating that it bore out Berkeley's theory of a bad bargain to settle by promises, and that he did not intend to hunt a good job for plaintiff. There was also introduced a report of the president and superintendent of the Northeastern Railroad Company, made to the stockholders June 21, 1887, upon the first leaf of which was printed some of the names of officers of the N. E. R. R., showing Pope Barrow president, and E. Berkeley its superintendent, and indicating management and operation by its own officers; extract from the report of the president, October 19, 1887, as to recommending a conveyance to one Thomas of the northern section of the Northeastern railroad, and submitting the report of the superintendent made to Barrow, as president of the Northeastern Railroad Company, for

the fiscal year ending October 1, 1887, also indicating as above; and similar extracts from reports of president and superintendent made in October, 1888.

Jacksons, Barrow & Thomas and A. J. Cobb, for the railroad company.

Lumpkin & Burnett and E. T. Brown, contra.